IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| IN RE TYSON FOODS, INC., | * | MDL Docket No. 1854 |
| | | 4:07-MD-1854(CDL) |
| FAIR LABOR STANDARDS ACT | * | |
| | | Case Nos. |
| LITIGATION | * | 1:07-CV-93 (CDL) |
| | | *Williams v. Tyson Foods, Inc.* |
| | * | 4:07-CV-2004 (CDL) |
| | | *Adams v. Tyson Foods, Inc.* |
| | * | 4:07-CV-2008 (CDL) |
| | | *Joyner v. Tyson Foods, Inc.* |
| | * | 4:07-CV-2016 (CDL) |
| | | *Balch v. Tyson Foods, Inc.* |
| | * | 4:08-CV-2000 (CDL) |
| | | *Meyer v. Tyson Foods, Inc.* |
| | * | 4:08-CV-2003(CDL) |
| | | *Armstrong v. Tyson Foods, Inc.* |
| | * | |

O R D E R

Plaintiffs bring claims against Defendant Tyson Foods, Inc. ("Tyson") for alleged violations of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-219 ("FLSA"). The Judicial Panel on Multidistrict Litigation transferred these actions to this Court for pretrial proceedings. The Court conditionally certified a collective action for each of Tyson's facilities involved in these actions, and Tyson agreed not to contest the conditional certification. The parties completed discovery as to eight "test" plants, and Tyson now moves to decertify the collective actions at each of those facilities. Presently pending before the Court are Tyson's motions to decertify collective actions at the eight "test" plants: Dawson, Georgia facility (Doc. 103 in 1:07-CV-93); Berry Street facility in Springdale, Arkansas (Doc. 204 in 4:07-CV-2004); Dardanelle, Arkansas

facility (Doc. 206 in 4:07-CV-2004); Pine Bluff, Arkansas facility (Doc. 209 in 4:07-CV-2004); Corydon, Indiana facility (Doc. 170 in 4:07-CV-2008); Broken Bow, Oklahoma facility (Doc. 178 in 4:07-CV-2016); Sedalia, Missouri facility (Doc. 98 in 4:08-CV-2000); and Union City, Tennessee facility (Doc. 141 in 4:08-CV-2003).  For the reasons set forth below, the motions to decertify are denied.

## BACKGROUND

Plaintiffs[1] are current and former employees at eight Tyson chicken processing plants.  Plaintiffs allege that Tyson wrongfully denied them compensation by not paying them for work they were required to perform while off the clock.  Specifically, Plaintiffs contend that Tyson has a policy of not compensating them for donning, doffing, and sanitizing safety and sanitary gear. Workers at each of the eight plants wear a variety of safety and sanitary gear while on duty.  The vast majority of hourly production employees are required to wear smocks, hairnets, beard nets, gloves, and earplugs. Additional safety and sanitary gear must be worn by some employees.

Plaintiffs contend that they are not paid for donning, doffing, and sanitizing activities, including time spent donning and doffing during meal breaks; nor are they paid for the post-donning/pre-doffing time they spend walking to/from the production floor. Plaintiffs also claim that Tyson had a common policy of not compensating employees for these activities.  Under its "mastercard"

---

[1]For purposes of this Order, "Plaintiffs" refers to the Plaintiffs who were or are Tyson employees at the eight "test" plants.

time system, Tyson pays employees only for time they spend working on the production line. They are not paid for any time before the line's mastercard time begins or after the line's mastercard time ends; thus, they are not paid for time spent donning, doffing, and sanitizing safety and sanitary gear outside the mastercard time.

Plaintiffs point to evidence that Tyson's official position is that donning and doffing activities are not compensable and that Tyson has no policy of compensating employees for such activities. (*E.g.*, Serrano Dep. 33:16-21, 38:19-39:3, 69:3-8, May 11, 2009.) Plaintiffs also point to evidence that employees must be at their work stations ready to work—wearing safety and sanitary gear—at the start of mastercard time. If employees are not punched in to the plant's time clock and on the line ready to work by the beginning of mastercard time, they may be subject to discipline, including docked pay and attendance points.[2] (*E.g.,* Kilgore Dep. 153:5-10, Mar. 3-4, 2009 (explaining punctuality expectations at Pine Bluff); Noles Dep. 111:16-112:10, Apr. 14, 2009 (discussing policy on tardiness at Union City); *see also* Standridge Dep. 113:3-114:1, Mar. 31, 2009 (explaining consequences for tardiness in certain department at Dardanelle).) Plaintiffs have also shown that employees are required to doff sanitary and safety gear at the beginning of unpaid meal

---

[2]Under Tyson's attendance point system, employees are given points if they have an unexcused tardy or absence; though employees may "work off" their points, employees who accumulate a certain number of attendance points are terminated. (*E.g.,* Standridge Dep. 115:3-116:7, 119:12-17, Mar. 31, 2009.)

breaks and that they are required to don the gear at the end of the breaks. Employees are not always compensated for time spent donning and doffing gear during unpaid breaks. (*E.g.,* Duggan Dep. 247:07-248:07, Mar. 11, 2009 (discussing breaks at Broken Bow); Noles Dep. 90:4-91:8 (addressing breaks at Union City); Wood Dep. 307:20-308:18, Mar. 18, 2009 (explaining breaks at Corydon).)

Tyson points out that each plant has multiple departments and lines and that each plant has at least two production shifts. (*E.g.,* Duggan Dep. 101:1-5, 106:20-107:20 (explaining Broken Bow operations); Gengler Dep. 12:13-19, Mar. 26, 2009 (listing departments at Sedalia); Holman Dep. 72:10-18, 74:9-10, May 13, 2009 (describing Berry Street operations).) Tyson argues that its line supervisors have the discretion to compensate employees for donning and doffing activities, and Tyson contends that the practices at the various Tyson plants varied not only by line but by shift and over time.[3] (*E.g.,* Treat Dep. 122:7-123:12, Apr. 7, 2009 (explaining that

---

[3] Tyson also argues that not all employees are paid strictly based on mastercard time. Each employee must "punch in" to a time clock upon arriving at the plant and "punch out" upon leaving. Some employees, such as certain Quality Assurance employees, are paid "punch to punch" and not on mastercard time. (*E.g.,* Wilt Dep. 39:22-40:11, Apr. 7, 2009.) This practice should be evident from the payroll records. Since there is no allegation or evidence that these employees are donning or doffing gear outside the punch to punch time, employees paid exclusively based on punch to punch time are compensated for any donning and doffing time and would not be class members.

Under some circumstances, punch time does impact employees who are paid under the mastercard system. If an employee is typically paid on mastercard time but punches in after the start of mastercard time, he is paid only from the punch in time, and if an employee punches out before the end of mastercard time, he is paid only to the punch out time. (Bacorn Dep. 187:9-18, Apr. 1-2, 2009 (explaining that at Dardanelle, when an employee clocks out before the mastercard end time, his paid time will

employees on a certain line at Berry Street receive five-minute grace period); Wood Dep. 249:16-250:9 (describing gap between start of mastercard time and when employees are expected to be on a certain line at Corydon).)

In support of its argument that no common approach exists, Tyson offers the following. First, Tyson presented evidence that employees on certain lines are given a "grace period," which means that they must be on the line a few minutes after mastercard time starts and are released a few minutes before mastercard time ends. (*E.g.*, Gengler Dep. 294:21-295:4 (explaining that second shift employees on certain Sedalia line receive three-minute grace time).) Grace periods may be given for pre- and post-production donning and doffing, as well as for donning and doffing during unpaid meal breaks. (*E.g., id.; see also* Blair Dep. 251:12-253:8, Apr. 15, 2009 (noting that certain employees at Union City get a thirty-five minute break, with five minutes of paid time); Kilgore Dep. 297:16-22 (asserting that certain Pine Bluff employees receive five minutes of paid walk time during their breaks).) Though the amount of grace time may vary from line to line, the employees on the same line

---

end at the clock-out time); Beck Dep. 37:3-5, Feb. 24, 2009 (noting that at Dawson, if an employee leaves early, he is paid to the punch time rather than mastercard end time).) For such situations, there is no evidence that employees don their gear before punching in or doff their gear after punching out; so under these circumstances, which should be readily apparent from payroll records, the employee has already been paid for donning or doffing and would thus have no claim for additional compensation on days that they were paid by the punch rather than the mastercard time.

during the same shift are given the same amount of grace time. (*E.g.*, Gengler Dep. 294:21-295:4 (explaining that second shift employees on certain Sedalia line receive three-minute grace time); Wood Dep. 249:16-250:9 (describing gap between start of mastercard time and when employees are expected to be on a certain line at Corydon).)  Second, Tyson pointed to evidence that some supervisors are more lenient than others regarding when an employee is marked tardy.  (*E.g.,* Duggan Dep. 167:2-8 (noting that certain Broken Bow employees may be several minutes late but will not generally be marked tardy).)  Third, Tyson presented evidence that at the various plants certain lines operate on staggered time, meaning that employees on certain lines are required to be on the production line when the first bird arrives at their station, so an employee at the end of that line would not have to be in place until several minutes after mastercard time began and the line started.  (*E.g.,* Bacorn Dep. 183:11-22 (explaining that Dardanelle employees on certain lines are not expected to be on the line until the product reaches them); Kilgore Dep. 245:1-10 (noting that certain Pine Bluff employees are expected to be on the line when the chicken gets to their station).)  Conversely, employees on such lines are permitted to leave the line after the last product passes their workstation, so employees at the front of the line are released earlier than those at the end of the

line.[4]  (*E.g.,* Wood Dep. 256:1-10 (explaining that certain Corydon employees are free to leave the line and begin doffing when the last product passes their station).)  Fourth, Tyson demonstrated that at some plants there is a general practice of approving pay to clock-out time if an employee works past mastercard time.  (*E.g.,* Beck Dep. 36:20-37:2 (explaining that, at Dawson, employees asked to work late would be paid to clock-out time instead of mastercard time); Cochrane Dep. 119:3-9, Apr. 8, 2009 (noting that a Berry Street supervisor may approve payment to clock-out time if an employee works past mastercard time).)  Fifth, Tyson points to evidence that some employees are paid for donning time because paid time on their line begins with a pre-production meeting, and donning of safety and sanitary gear occurs during or after that meeting on paid time. (*E.g.*, Jackson Dep. 17:14-18:7, Apr. 16, 2009 (explaining that at Union City, employees on certain lines are required to attend pre-production meetings, during which they may don their gear).)

## DISCUSSION

The FLSA authorizes collective actions against employers accused of violating the FLSA.  29 U.S.C. § 216(b).  To maintain an FLSA

---

[4] Tyson also points out that circumstances beyond the employees' control may cause a line to start late or end early.  For example, lines are occasionally late to start because of mechanical problems, giving employees extra time after the beginning of mastercard time to get in place, or a line may shut down before the end of mastercard time because there is no more product.  (*E.g.*, Holman Dep. 157:19-158:5 (explaining that a certain line at Berry Street rarely starts on time because of mechanical issues).)  Under such circumstances, the evidence suggests that the employees are still paid on mastercard time. (*Id.*)

collective action, the plaintiffs must show that they are similarly situated. *Id.*; *accord Anderson v. Cagle's, Inc.*, 488 F.3d 945, 952 (11th Cir. 2007). The Eleventh Circuit employs a two-tiered § 216(b) class certification approach. *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001) (per curiam). Under this approach, the first step is conditional certification of a collective action and authorization of notice to potential opt-in plaintiffs. *Id.* at 1218. After the opt-in period has ended and discovery is complete, a conditionally certified class may be decertified if the evidence shows that the members of the conditionally certified class are not similarly situated. *Id.* At the second stage, the standard for "similarly situated" is more stringent than it is at the first stage. Typically, at the second stage, the court has more evidence and can thus make a more informed factual determination of similarity. *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008). The Court follows the *Hipp* approach in this case. Since Tyson did not contest conditional certification, the case proceeds to the second stage where the Court must finally resolve the certification issue through Tyson's motions for decertification.

At the decertification stage, in determining whether employees are similarly situated for purposes of an FLSA collective action, the courts generally consider three main factors: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various

defenses available to defendant[s] [that] appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations[.]" *Morgan*, 551 F.3d at 1261 (alterations in original) (internal quotation marks omitted). To survive a motion for decertification, the potential class members need not hold identical positions, but "the similarities necessary to maintain a collective action under § 216(b) must extend beyond the mere facts of job duties and pay provisions." *Cagle's*, 488 F.3d at 953 (internal quotation marks omitted). To meet their burden, Plaintiffs must make "substantial allegations of class-wide" violations, which means that Plaintiffs must make detailed allegations of class-wide violations, supported by evidence that "successfully engage[s]" the employer's evidence to the contrary. *Hipp*, 252 F.3d at 1219 (internal quotation marks omitted). For example, Plaintiffs may establish that they are similarly situated by presenting evidence to show that their employer engaged in a "unified policy, plan, or scheme" of FLSA violations, *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir. 1996), or if they can otherwise show that the positions of the potential class members are similar, *Hipp*, 252 F.3d at 1217, 1219. However, even if Plaintiffs' positions are sufficiently similar, the Court must also consider "whether the defenses that apply to the opt-in plaintiffs' claims are similar to one another or whether they vary significantly." *Morgan*, 551 F.3d at 1262.

As the Court has previously observed, at "the core of the 'similarly situated' inquiry is the question whether the issues in the case can be adjudicated collectively." *Hill v. Muscogee County Sch. Dist.*, No. 4:03-CV-60 (CDL), 2005 WL 3526669, at *3 (M.D. Ga. Dec. 20, 2005). Tyson presented the Court with extensive evidence which it argues demonstrates a litany of significant differences among Plaintiffs. The Court has reviewed this evidence, which, as discussed above, shows that at each plant there are at least two production shifts, that there are numerous departments and lines within each plant, and that there are differences in the amount of sanitary and safety gear worn by different employees. The evidence also demonstrates that the line supervisors at the different plants exercise varying levels of flexibility regarding whether employees must be at their work stations when "mastercard" time begins. There is also evidence that some line supervisors have a formal grace period between the start of mastercard time and the time an employee is expected to be at his or her station. Thus, Tyson argues, some Plaintiffs are already paid for some or all of their donning, doffing, and walking time. Based on these arguments, Tyson asserts that Plaintiffs are not similarly situated and that the class should be decertified. Tyson also asserts that collective adjudication will be difficult for those employees on lines with staggered start and end times.

Plaintiffs contend that any differences in their employment settings are immaterial because they are all subject to Tyson's corporate policy of paying them based on mastercard time and not paying them for donning and doffing time. Plaintiffs also argue that Tyson's defenses are not as individualized as Tyson suggests. Plaintiffs have submitted evidence that they are paid based on mastercard time and that this payment method does not include time Plaintiffs spend donning, doffing, and sanitizing safety and protective gear—whether at the beginning or end of a shift or at the beginning or end of an unpaid meal break.

The Court concludes that sufficient evidence exists to show that Plaintiffs were paid by mastercard time and that they were not paid for some or all of the time they spent donning, doffing, and sanitizing their safety and protective gear. Tyson's common practice of paying Plaintiffs by the mastercard method weighs heavily against decertification.

Furthermore, Tyson's argument that it needs to put on individualized defenses that swamp the common issues is weak. Though there is evidence that some plant supervisors may allow a grace period that they subjectively believe makes up for the exclusion of donning and doffing from mastercard time, the record supports a finding that the general practice is *not* to pay employees for donning and doffing. In those instances where an individual plant manager or line supervisor allows for some grace time that may compensate

employees for some donning and doffing, the present record supports a finding that those grace periods are relatively uniform on a plant basis and/or a production line basis, so any differences in the amount of grace time can be handled with little difficulty, even if subclasses must be formed to account for the differences.[5] The same is true for plants where employees on certain lines start the compensable workday with a pre-production meeting prior to donning their gear or where there is a general policy of paying for doffing time because employees are paid until their punch out time. As to Tyson's argument that some employees were paid punch to punch and thus have no claim because they have been paid for all donning and doffing time, those employees would not be members of the class and are therefore excluded.

Tyson argues in its briefing that Plaintiffs' proposed method of proving their damages will also cause individualized issues to swamp common ones. However, as clarified by Plaintiffs' counsel at the hearing, Tyson misunderstood Plaintiffs' approach.[6] In addition to

---

[5] This includes lines that operate on staggered time, where the grace period consists of permitting an employee to arrive on the line after the start of mastercard time but before the product reaches his work station or allowing an employee to leave the production line before the end of mastercard time and after the last product passes his work station. In such cases, the grace time will be similar for all employees on the particular line-though some employees may receive all of it on the front end or the back end.

[6] Tyson believed Plaintiffs intended to establish the amount of donning and doffing time by showing the gap between the punch time, which generally started when an employee arrived at the plant, and the mastercard time. Given the evidence that employees arrive at various times and that some engage in non-compensable activities, such as eating breakfast, after punching in and before mastercard time begins, the "gap

the evidence that they contend establishes a corporate policy of not paying for donning and doffing, Plaintiffs intend to present testimony, including testimony in the form of sample representative testimony, as to the amount of time it actually takes to don, doff, and sanitize sanitary and protective gear and walk to the line. *See, e.g., Morgan*, 551 F.3d at 1277-79 (approving use of representative testimony in addition to direct evidence to establish FLSA claims in collective action, so long as representatives performed substantially similar work to non-testifying plaintiffs). The Court finds that Plaintiffs' method for proving damages does not defeat certification.

The Court notes that other courts have certified collective actions regarding donning and doffing of safety and sanitary gear in the meat and poultry processing setting, finding them manageable. *E.g., Johnson v. Koch Foods, Inc.*, 657 F. Supp. 2d 951, 956 (E.D. Tenn. 2009) (allowing collective action to go forward where defendant had common policy of paying plaintiffs by production line time); *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 901 (N.D. Iowa 2008) (limiting class to workers paid on "gang time"); *Jordan v. IBP, Inc.*, 542 F. Supp. 2d 790, 812-14 (M.D. Tenn. 2008) (concluding that

---

time" method is not appropriate for collective adjudication. *See Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1193-94 (11th Cir. 2009) (finding, in Rule 23 context, that individualized issues predominated over common issues with regard to establishing damages via gap time method because some employees arrived early or stayed late for purely personal reasons). However, as Plaintiffs clarified at the hearing on the motion for decertification, Plaintiffs do not plan to establish damages by comparing the punch time to the mastercard time.

13

production work aspect of plaintiffs' meal period claim was suitable for class treatment where defendants had common policy of automatically deducting thirty minutes of pay for each shift an employee worked). *Johnson* was tried to a verdict in January 2010, and *Bouaphakeo* is scheduled for trial later this year. The parties in *Jordan* reached a settlement. While not dispositive, these experiences suggest that Defendant's objections are overstated.

CONCLUSION

For the reasons previously explained, the Court denies Tyson's motions to decertify collective actions at the eight "test" plants. (Doc. 103 in 1:07-CV-93; Doc. 204 in 4:07-CV-2004; Doc. 206 in 4:07-CV-2004; Doc. 209 in 4:07-CV-2004; Doc. 170 in 4:07-CV-2008; Doc. 178 in 4:07-CV-2016; Doc. 98 in 4:08-CV-2000; and Doc. 141 in 4:08-CV-2003.) This ruling should conclude the pretrial proceedings for these cases. Since this Court cannot conduct trials of those cases that did not originate in this district, those cases appear ready to be transferred back to their original districts. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40 (1998).

The Court finds it appropriate, however, to delay the transfer of those cases until after it has tried the one test case that originated in this district, *Williams v. Tyson Foods, Inc.*, 1:07-CV-93, involving Tyson's Dawson, Georgia facility. Trying that case as a bellwether trial will likely either confirm the wisdom of the Court's ruling today or will demonstrate its flaws. Depending upon

the *Williams* experience, the Court will either transfer the other cases with reassurance that they are manageable as collective actions or will reconsider today's ruling.

Accordingly, the Court schedules the case of *Williams v. Tyson Foods, Inc.*, 1:07-CV-93, for a jury trial to begin at 9:00 A.M. on August 16, 2010 at the United States Courthouse in Columbus, Georgia.[7] A final pretrial conference shall be held for that case at 9:30 A.M. on May 26, 2010 at the United States Courthouse in Columbus, Georgia. If the parties believe that additional pretrial discovery or proceedings are necessary to get the case ready for trial, they shall submit a joint proposed amended scheduling order within fourteen days of today's Order that allows such discovery and pretrial proceedings to be completed by the date of the final pretrial conference.

As to the remaining actions involving the Tyson facilities that were not selected to be test plants in this first phase, the parties shall submit a joint proposed scheduling order and/or report as to how pretrial proceedings regarding those plants should be handled and the timing of those pretrial proceedings. That joint proposed scheduling order and/or report shall be filed within twenty-one days of today's Order.

---

[7] The Court is aware that *Williams* was originally filed in the Albany Division. Given the relative close proximity of Dawson to Columbus, the Court finds that trying the case in the Columbus Division should not be an undue hardship for the parties or witnesses.

IT IS SO ORDERED, this 16th day of March, 2010.

                                                S/Clay D. Land
                                                   CLAY D. LAND
                                        UNITED STATES DISTRICT JUDGE